# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 19-9478-GW-FFMx | Date | April 8, 2020 |
|---|---|---|---|
| Title | *Estela Escarcega, et al. v. Verdugo Vista Operating Company, LP, et al.* | | |

Present: The Honorable    GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | None Present | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys Present for Plaintiffs:    Attorneys Present for Defendants:

None Present    None Present

**PROCEEDINGS:**    **IN CHAMBERS - RULING ON PLAINTIFFS' MOTION TO REMAND TO THE LOS ANGELES SUPERIOR COURT FOR LACK OF SUBJECT MATTER JURISDICTION [17]; and REGAL MEDICAL GROUP, INC.'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UNDER FED. R. CIV. P. 12(B)(6) AND FOR LACK OF SUBJECT MATTER JURISDICTION UNDER FED. R. CIV. P. 12(B)(1) [12]**

Attached hereto is the Court's Final Rulings on above Motions. The Court DENIES Plaintiffs' Motion to Remand. Additionally, the Court GRANTS Regal's Motion to Dismiss Plaintiffs' wrongful death claim
against Regal. Finally, the Court REMANDS the remaining claims back to the Los Angeles Superior Court.

    :
Initials of Preparer    JG

## I.    Background

Plaintiffs Estela Escarcega, by and through her successor in interest, Hector Escarcega, and Hector Escarcega as an individual sue Defendants Verdugo Vista Operating Company, LP ("Verdugo"), dba LA Crescenta Healthcare Center; Regal Medical Group, Inc. ("Regal"); Pabso J. Bassuk, M.D.; and Does 1-25, for: (1) elder abuse and neglect, in violation of Cal. Welf. & Inst. Code § 15600 *et seq.*, against Verdugo and Does 1-25; (2) violation of resident rights, in violation of Cal. Health & Saf. Code § 1430(b), against Verdugo; and (3) wrongful death, against all Defendants. *See generally* Complaint, Docket No. 1-1.

Plaintiffs allege the following: Estela Escarcega was a resident of California who died on August 31, 2018. *See id.* ¶ 1. She was an elderly person who had physical and mental limitations. *See id.* ¶ 2. On July 27, 2018, Ms. Escarcega slipped and fell, fracturing her hip. *See id.* ¶ 23. She was hospitalized and underwent surgery to repair her fractured hip. *See id.* After being discharged from the hospital, Ms. Escarcega was transferred to La Crescenta Healthcare Center ("La Crescenta"), a Skilled Nursing Facility, to rehabilitate and receive physical therapy to regain her strength and minimize her fall risk. *See id.* ¶ 24. During Ms. Escarcega's stay at La Crescenta, staff did not provide her with the care and treatment that she required, including nursing and therapy services. *See id.* ¶ 25. Specifically, Ms. Escarcega was laid flat for extended periods of time, without being regularly turned and repositioned. *See id.* Furthermore, La Crescenta staff failed to use affordable and easily accessible mechanisms and devices to offload pressure from Ms. Escarcega's bony prominences, such as pillows, heel boots, heel floats, sheepskin heel protectors, etc. *See id.* Ms. Escarcega's condition deteriorated while in the care of La Crescenta. *See id.* ¶ 26. Within 2-10 days of being admitted there, Ms. Escarcega developed pressure wounds on both of her heels. *See id.* She also developed severe edema and serious infections. *See id.*

On August 24, 2018, Ms. Escarcega's family met with Dr. Bassuk and a case manager from Regal Medical Group, Inc. ("Regal") to discuss her condition and care. *See id.* ¶ 27. Hector Escarcega requested that Ms. Escarcega be transferred to a higher level of care. *See id.* Dr. Bassuk and the Regal case manager denied this request. *See id.* Ms. Escarcega's condition

continued to deteriorate. *See id.* ¶ 28. Her family again voiced their concerns to La Crescenta staff, asking for her to be evaluated by a doctor and transferred to a higher level of care. *See id.*

On August 27, 2018, Ms. Escarcega was rushed to the hospital in severe respiratory distress. *See id.* ¶ 29. She had an emergency intubation and was admitted to the ICU. *See id.* At the hospital, Ms. Escarcega was diagnosed with aspiration pneumonia, sepsis, and severe protein-caloric malnutrition. *See id.* She was also diagnosed with severe bilateral heel wounds, one of which had progressed to Stage IV. *See id.* Stage IV bedsores are the most severe form of bedsore and are life-threatening. *See id.* They carry risks of infection as a result of the open site and are excruciatingly painful. *See id.* The most common and likely cause of skin breakdown in a patient like Ms. Escarcega is unrelieved pressure on the bony prominences of the body, such as her heels. *See id.* ¶ 31. Over the course of Ms. Escarcega's admission to La Crescenta, her skin started to break down, first superficially at the layer of the skin, characterized as visible redness; then through the tissue and muscle, which was raw and exposed. *See id.* Defendants knew Ms. Escarcega's condition was breaking down long before she was transferred to Verdugo Hills Hospital, because La Crescenta's staff were responsible for dressing her, bathing her, and inspecting her skin, and they would have seen the wounds developing when providing these basic services. *See id.* Regal also knew Ms. Escarcega's condition was breaking down long before she was transferred to Verdugo Hills Hospital, because Regal assigned a case manager to follow her care at La Crescenta and got reports and updates on her condition throughout her stay. *See id.* ¶ 33.

As a result of Defendants' conduct, Ms. Escarcega suffered from the following conditions:

| Condition on date of admission to LA CRESCENTA HEALTHCARE CENTER | Condition on date of discharge from CRESCENTA HEALTHCARE CENTER |
| --- | --- |
| No wounds on body; clear skin; low risk for wounds | Development of pressure wounds on both heels, one of which had progressed to stage 4 heel |

| | |
|---|---|
| Stable fluid status | Out of control edema (swelling due to buildup of fluid) |
| Stable lab values | Deteriorating lab values indicating anemia, Severe protein-calorie malnutrition, and elevated blood glucose |
| Free of infection | Sepsis, urinary tract infection, and aspiration pneumonia |
| Taking routine dementia medications, Namenda and Donepezil | On August 1, 2018, prescribed psychotropic medication, Paroxetine, 10 mg. Paroxetine also has associated side effects of dizziness, drowsiness and feeling tired. |
| Condition stable and strong enough to be a suitable candidate for and undergo hip repair surgery at age 95; expected to recover with good prognosis and rehabilitation potential | Described on admission to Verdugo Hills as critically ill and unstable; died within days of admission to hospital. |

*Id.* ¶ 34.

Ms. Escarcega remained hospitalized at Verdugo Hills Hospital from August 27, 2018 until her death on August 31, 2018. *See id.* ¶ 36.

Plaintiffs filed a complaint in the Superior Court of California, County of Los Angeles, on August 26, 2019. *See* Complaint, Docket No. 1-1. On November 4, 2019, Defendant Regal removed the case to this Court pursuant to the federal officer removal statute, 28 U.S.C. § 1442. *See* Notice of Removal ("NOR"), Docket No. 1.[1] Defendant Regal alone filed a Motion to Dismiss on November 18, 2019. *See* Motion to Dismiss ("MTD"), Docket No. 12. Plaintiffs oppose, *see* Opposition to Motion to Dismiss ("MTD Opp'n"), Docket No. 19, and Defendant replies, *see* Reply in Support of Motion to Dismiss ("MTD Reply"), Docket No. 23. Plaintiffs filed a Motion to Remand on December 4, 2019. *See* Motion to Remans ("MTR"), Docket No. 17. Defendant opposes, *see* Opposition to Motion to Remand ("MTR Opp'n"), Docket No. 20,

---

[1] In the NOR, Regal claims that: "Plaintiffs sued Regal for actions that it took 'under color of' federal law while acting under the direction of the Centers for Medicare and Medicaid Services ('CMS'), an agency within the United States Department of Health and Human Services . . . . Plaintiffs allege that Regal offers Medicare services to seniors enrolled in the Secure Horizons Medicare Advantage ('MA') health plan that is financed by the federal Medicare program." *See* NOR ¶¶ 3-4. The complaint avers that Regal: "does business as a Medicare HMO . . . . REGAL MEDICAL GROUP, INC. offers services to seniors under an agreement with the federal Medicare program under the name 'Secure Horizons.' The Secure Horizons plan is financed by the federal Medicare program, in that applicant-enrollees for the Secure Horizons plan assign their 'Medicare Benefits' to REGAL MEDICAL GROUP, INC." *See* Complaint ¶ 12.

and Plaintiffs reply, *see* Reply in Support of Motion to Remand ("MTR Reply"), Docket No. 22.
With the Court's authorization (*see* Docket No. 31), Plaintiffs also filed a supplemental brief, *see*
Plaintiffs' Further Briefing re: Motion to Remand ("Pl. Supp."), Docket No. 32, to which
Defendant replied, *see* Reply in Support of Motion ("Def. Supp."), Docket No. 36.

## II.    Legal Standard

### A.  Motion to Remand

"Federal courts are courts of limited jurisdiction," and they have subject matter
jurisdiction only to the extent "authorized by Constitution and statute." *Kokkonen v. Guardian
Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citing *Willy v. Coastal Corp.*, 503 U.S. 131, 136-
37 (1992); *Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541 (1986)). Regal removed
the case under the federal officer removal statute, 28 U.S.C. § 1442(a)(1). Section 1442(a)(1)
states:

> (a) A civil action or criminal prosecution that is commenced in a State court and
> that is against or directed to any of the following may be removed by them to the
> district court of the United States for the district and division embracing the place
> wherein it is pending:
>
>> (1) The United States or any agency thereof or any officer (or any person
>> acting under that officer) of the United States or of any agency thereof, in
>> an official or individual capacity, for or relating to any act under color of
>> such office or on account of any right, title or authority claimed under any
>> Act of Congress for the apprehension or punishment of criminals or the
>> collection of the revenue.

Removal under § 1442 differs from removal and remand in general in various ways:

> Unlike the general removal statutes, which "are to be strictly construed, and any
> doubts as to the right of removal must be resolved in favor of remanding to state
> court," [*Durham v. Lockheed Martin Corp.*, 445 F.3d 1247,] 1252 [(9th Cir.
> 2006)] (citation omitted), "the Supreme Court has mandated a generous
> interpretation of the federal officer removal statute," *id.* (citing *Colorado v.
> Symes*, 286 U.S. 510, 517 (1932)). There is, according to the Ninth Circuit, "a
> clear command from both Congress and the Supreme Court that when federal
> officers and their agents are seeking a federal forum, we are to interpret section
> 1442 broadly in favor of removal." *Id.* Also unlike the general removal statues,
> under section 1442, not all defendants need concede to removal. *See El[y] Valley
> Mines, Inc. v. Hartford Accident & Indem. Co.*, 644 F.2d 1310, 1315 (9th Cir.
> 1981) ("Thus, § 1442 represents an exception to the general rule (under §§ 1441
> and 1446) that all defendants must join in the removal petition."). One defendant
> in a multi-defendant case can unilaterally remove the entire case to federal court if
> it meets the requirements of section 1442. *See id.*

*Savelesky v. Allied Packing & Supply Inc.*, No. C 11-01778 SI, 2011 WL 2610179, at *3 (N.D.

Cal. July 1, 2011). However, the Supreme Court has cautioned that § 1442's broad language "is not limitless." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007).

A party seeking federal officer removal must establish that: "(a) it is a 'person' within the meaning of the statute; (b) there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claims; and (c) it can assert a 'colorable federal defense.'" *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1251 (9th Cir. 2006) (citing *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999); *Mesa v. California*, 489 U.S. 121, 124-25 (1989).

**B. Motion to Dismiss – 12(b)(1)**

Rule 12(b)(1) authorizes a motion to dismiss for lack of subject matter jurisdiction. *See* Fed. R. Civ. Proc. 12(b)(1). Dismissal pursuant to Rule 12(b)(1) is appropriate when either the complaint or evidence extrinsic to the complaint demonstrates that the court lacks subject matter jurisdiction over the action. *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987). Rule 12(b)(1) challenges can be either factual or facial. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). In a "facial" Rule 12(b)(1) motion, "the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

**C. Motion to Dismiss – 12(b)(6)**

Under Rule 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A complaint may be dismissed for failure to state a claim for one of two reasons: (1) lack of a cognizable legal theory; or (2) insufficient facts under a cognizable legal theory. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see also Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008) ("Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."). The court must construe the complaint in the light most favorable to the plaintiff; accept all allegations of material fact as true; and draw all reasonable inferences from well-pleaded factual allegations. *Gompper v. VISX, Inc.*, 298 F.3d 893, 896 (9th Cir. 2002); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001), amended on denial of reh'g, 275 F.3d 1187 (9th Cir. 2001); *Cahill v. Liberty Mutual Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996). The court is not required to accept as true legal conclusions couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Where a plaintiff facing a 12(b)(6) motion has pled "factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged," the motion should be denied. *Id.*; *Sylvia Landfield Trust v. City of Los Angeles*, 729 F.3d 1189, 1191 (9th Cir. 2013). But if "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged − but it has not show[n] . . . the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (citations omitted).

## III.   Statutory Background

The Medicare Act, 42 U.S.C. §§ 1395 *et seq.* ("Medicare") is a federally subsidized health insurance program for elderly and disabled persons. The Secretary of Health and Human Services (the "Secretary") administers Medicare through the Center for Medicare and Medicaid Services ("CMS"). *Id.* Medicare consists of four main parts; Part C is relevant here. Part C establishes the Medicare Advantage ("MA") program, which allows Medicare beneficiaries to elect to receive their benefits through a private health insurance plan administered by a Medicare Advantage Organization ("MAO"). 42 U.S.C. §§ 1395w-21–1395w-29. In other words, MAOs are private insurance companies that contract with CMS to provide MA plans to qualified beneficiaries in exchange for monthly fees from Medicare. *See Phillips v. Kaiser Found. Health Plan, Inc.*, 953 F. Supp. 2d 1078, 1082 (N.D. Cal. 2011).

CMS establishes criteria for Medicare coverage determinations by MAOs, with coverage generally precluded for services that "are not reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(1)(A). An enrollee who is dissatisfied with a Medicare coverage determination must present a claim through the designated appeals process and exhaust available administrative remedies. *See* 42 U.S.C. §§ 1395u(b)(3)(C), 1395ff(b) (incorporating by reference 42 U.S.C. § 405(b)); *see also* 42 C.F.R. §§ 422.582 *et seq.* (describing the administrative appeals process for Medicare Part C). Judicial review of the "final decision" of the Secretary is available once the administrative process is exhausted. 42 U.S.C. § 405(g).

## IV.   Discussion

### A.  Motion to Remand

Plaintiffs argue that this case should be remanded to the Los Angeles Superior Court for lack of subject matter jurisdiction. According to Plaintiffs, federal officer removal does not support jurisdiction in this case. As discussed above, federal officer removal is appropriate when the removing defendant establishes that: "(a) it is a 'person' within the meaning of the statute; (b)

there is a causal nexus between its actions, taken pursuant to a federal officer's directions, and plaintiff's claims; and (c) it can assert a colorable federal defense." *Durham*, 445 F.3d at 1251 (internal quotations and citation omitted). Here, Plaintiffs do not appear to dispute that the first element is satisfied. Instead, the parties disagree as to whether Regal's actions were "taken pursuant to a federal officer's directions" and whether Regal "can assert a colorable federal defense." *Id.*

### 1. *Acting Under Federal Authority*

For federal officer jurisdiction, the Court must determine whether Regal was acting under federal authority when it denied Ms. Escarcega's transfer request. The Supreme Court addressed the meaning of "acting under" a federal officer in *Watson v. Philip Morris Cos.*, 551 U.S. 142 (2007). It explained that "acting under" characterizes a relationship in which a party "act[s] in a certain capacity, considered in relation to one holding a superior position or office." *Id.* at 151. Such a relationship "typically involves subjection, guidance, or control," and "the private person's 'acting under' must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." *Id.* at 151-52 (emphasis in original) (internal quotations and citations omitted). While the Court stated that the term must be "liberally construed," it also cautioned against overbroad application:

> The upshot is that a highly regulated firm cannot find a statutory basis for removal in the fact of federal regulation alone. A private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase "acting under" a federal "official." And that is so even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored. A contrary determination would expand the scope of the statute considerably, potentially bringing within its scope state-court actions filed against private firms in many highly regulated industries. Neither language, nor history, nor purpose lead us to believe that Congress intended any such expansion.

*Id.* at 153 (internal citation omitted).

First, the Court must address an issue of categorization. Most of the cases dealing with the question of whether federal officer jurisdiction exists in this context consider whether MAOs are subject to federal officer removal. *See infra.* As described above, MAOs are private insurers that contract with CMS to provide medical treatment to Medicare enrollees. *See* 42 U.S.C. §§ 1395w-24-25. Under the Medicare Act, MAOs make determinations as to whether various treatments are covered by the Medicare regulations. *See* 42 U.S.C. § 1395w-22(g)(1)(A). They

maintain ultimate responsibility for complying with the terms of their contracts with CMS. *See* 42 C.F.R. § 422.504(i)(1). In turn, MAOs may contract with third parties to provide health care or administrative services to Medicare enrollees; these third parties are known as "first-tier" or "downstream" entities. *See* 42 C.F.R. § 422.2. A first-tier entity is a party that contracts with an MAO to provide Medicare services, while a downstream entity is a party that contracts to provide Medicare services below the level of the contract between the MAO and the first-tier entity. *See Provident Care Mgmt., LLC v. WellCare Health Plans, Inc.*, No. 16-cv-61873-BLOOM/Hunt, 2018 U.S. Dist. LEXIS 17575, at *11-12 (S.D. Fla. Jan. 31, 2018); 42 C.F.R. § 422.2. Regal is such a third party, although it is not entirely clear whether it is a first-tier or a downstream entity. *See* Pl. Supp. at 3 (calling Regal "a downstream entity with which the MA organization, in this case United Healthcare, contracted with CMS to provide services"); Def. Supp. at 12 (calling Regal "a capitated risk-bearing entity that assisted CMS by performing core MAO insurance functions"); Def. Supp. at 13 (calling Regal a first-tier entity). Either way, the distinction between first-tier and downstream entities does not seem to have much practical significance here: both are part of the chain of providers from MAO to Medicare patient. Here, the Court must determine whether first-tier and downstream entities should be treated differently from MAOs for federal officer removal. If not, then the Court may look to cases considering whether MAOs are subject to federal officer removal to determine whether it has jurisdiction.

The Court was unable to find any cases directly addressing the question of whether first-tier or downstream entities "act under" a federal officer for federal officer removal. Several courts have considered the differences between MAOs and downstream entities in a slightly different context, under the Medicare Secondary Payer Act (the "MSPA"), 42 U.S.C. § 1395y(b)(2). The MSPA makes Medicare the secondary, rather than primary, payer for services provided to Medicare beneficiaries who are covered by private insurers for the same services. *Id.* The MSPA contains a private cause of action allowing the secondary payer to sue when the primary payer fails to reimburse Medicare for such payments. 42 U.S.C. § 1395y(b)(3)(A). In determining which entities have standing to sue under the MSPA's private cause of action, some courts have distinguished between MAOs and downstream entities. These cases hold that the MSPA allows an MAO, but not a downstream entity, to sue a primary payer for nonpayment. *See, e.g., MSP Recovery Claims, Series LLC v. Auto-Owners Ins. Co.*, No. 1:17-CV-23841-PAS, 2018 WL 1953861, at *6 (S.D. Fla. Apr. 25, 2018), *appeal dismissed sub nom. MSP Recovery*

*Claims, Series LLC v. Ace Am. Ins. Co.*, No. 18-12139-GG, 2018 WL 6132508 (11th Cir. Nov. 8, 2018)); *MSP Recovery Claims, Series LLC v. ACE Am. Ins. Co.*, No. 17-CV-23749, 2018 WL 1547600, at *7 (S.D. Fla. Mar. 9, 2018), *reconsideration denied*, No. 17-CV-23749, 2018 WL 2316647 (S.D. Fla. May 18, 2018), *appeal filed MSP Recovery Claims, Series L v. Ace Am. Ins. Co.*, No. 18-12139 (11th Cir.). *Auto-Owners* and *ACE* appear to reach this distinction primarily based on the fact that no appellate courts had previously allowed a first-tier or downstream entity to bring suit under 42 U.S.C. § 1395y(b)(3)(A) − not because any appellate court had rejected their ability to do so. *Id.* In contrast, other cases hold that first-tier or downstream entities do have a private right of action under the MSPA, reasoning that "first-tier and downstream entities would suffer the same injury as MAOs when the primary payer failed to pay or reimburse them." *MAO-MSO Recovery II, LLC v. Mercury General*, No. CV 17-02525-AB (AJWx), 2018 U.S. Dist. LEXIS 192294, at *22 (C.D. Cal. May 23, 2018); *see also MSP Recovery Claims, Series LLC v. Farmers Ins. Exch.*, No. 2:17-cv-02522-CAS (PLAx), 2018 U.S. Dist. LEXIS 221653, at *46-47 (C.D. Cal. Aug. 13, 2018) (reasoning that first-tier and downstream entities suffer the same injuries as MAOs when primary payers fail to reimburse them and that no principled distinction had been provided between MAOs and first-tier or downstream entities).

Importing this logic into the federal officer removal context, the Court is inclined to agree with *Mercury General* and *Farmers Ins.* that there is no principled distinction to be made between an MAO and Regal in this case. Under the Medicare Act's regulatory scheme, a first-tier or downstream provider is contractually delegated part of an MAO's obligations to administer an MA plan. The contract must be "acceptable to CMS," 42 C.F.R. § 422.2, and CMS maintains significant oversight and control over the performance of these delegated responsibilities, *see* 42 C.F.R. §§ 422.504(i)(2)(i)-(iv), 422.504(i)(4)(ii), 422.504(i)(4)(v). As such, the Court would not distinguish between an MAO and a first-tier or downstream entity such as Regal for purposes of federal officer removal. Therefore, the Court now turns to the cases considering whether MAOs are subject to federal officer removal as instructive in this case.

A handful of courts have addressed the question of whether an MAO acts under federal authority for purposes of federal officer removal. The one court of appeals to address this question concluded in an unpublished decision that "the relationship between CMS and MAOs is not so unusually close that [MAOs] may wield the officer-removal statute." *Ohio State*

*Chiropractic Ass'n v. Humana Health Plan Inc.*, 647 F. App'x 619, 622-23 (6th Cir. 2016). The Sixth Circuit contrasted MAOs, which are paid a set monthly fee from Medicare, with private insurers under Medicare Part B, which "'act on behalf of CMS,' as 'the Secretary's agents,'" providing a "fee-for-service arrangement [under which] the Secretary pays the cost of claims administration." *Id.* at 622 (quoting 42 C.F.R. § 421.5(b) and *Schweiker v. McClure*, 456 U.S. 188, 190 (1982)). Unlike insurers under Part B, MAOs under Part C were created "in the hope that the private sector would make delivering Medicare benefits cheaper and more efficient." *Id.* As such, MAOs "can design MA plans as they see fit," and they "have free rein to decide: the network of providers with whom they contract, 42 C.F.R. § 422.4; the benefits to provide enrollees beyond traditional Medicare, *id.* § 422.102(b); the out-of-pocket costs that they charge enrollees, *id.* § 422.111(f)(5); and the care that enrollees can obtain from out-of-network providers, *ibid.*" *Id.* at 623. Based on these considerations, the Sixth Circuit concluded that, while "MAOs are still subject to extensive regulatory requirements[,] . . . their autonomy to 'utilize innovations [of] the private market' in MA plan design indicates that MAOs are not closely supervised or controlled by CMS." *Id.* (quoting H.R. Rep. No. 105-217, at 585 (1997) (Conf. Rep.)) (second alteration in original). Based on this analysis, the Sixth Circuit found that federal officer removal does not apply to MAOs. *Id.* A number of district courts have reached the same conclusion. *See, e.g., Shalaby v. Heritage Physician Network*, 364 F. Supp. 3d 693, 696-97 (S.D. Tex. 2019); *Premier Inpatient, LLC v. Aetna Health & Life Ins. Co.*, 362 F. Supp. 3d 1217, 1225 (M.D. Fla. 2019); *Vaccarino v. Aetna, Inc.*, No. EDCV 18-02349 JGB (SHKx), 2018 WL 6249707, at *6 (C.D. Cal. Nov. 29, 2018), appeal dismissed, No. 18-56583, 2019 WL 6606767 (9th Cir. June 7, 2019); *Kindred Hosps. E., L.L.C. v. WellCare of Fla., Inc.*, No. 8:17-cv-864-T-17AEP, 2018 U.S. Dist. LEXIS 225542, at *12 (M.D. Fla. Feb. 2, 2018); *Morrision v. Humana, Inc.*, No. 3:16-CV-00598-GNS, 2017 WL 2312476, at *3 (W.D. Ky. May 26, 2017).

Other district courts, relying on the Supreme Court's directive that the federal officer removal statute must be liberally construed, have concluded that MAOs do act under federal officials for purposes of federal officer removal. Those courts have found that by administering Medicare benefits through the private market, MAOs help CMS "fulfill [a] basic governmental task." *Body & Mind Acupuncture v. Humana Health Plan, Inc*., No. 1:16CV211, 2017 WL 653270, at *5 (N.D.W. Va. Feb. 16, 2017) (quoting *Watson*, 551 U.S. at 153). Under this logic, "[a]bsent [MAOs], CMS would be obligated to administer Medicare benefits through Parts A

and B to those individuals who currently elect Part C coverage. Thus, SCAN's activities 'involve an effort to assist, or to help carry out, the duties or tasks of' CMS in a manner much more significant than 'simply complying with the law.'" *Inchauspe v. Scan Health Plan*, No. 2:17 CV-06011 CAS (JCx), 2018 WL 566790, at *5 (C.D. Cal. Jan. 23, 2018); *see also Gordy v. CareMore Health Plan*, No. SACV 19-00048 JVS (JDEx), 2019 WL 1237421, at *3 (C.D. Cal. Mar. 18, 2019); *Assocs. Rehab. Recovery, Inc. v. Humana Med. Plan, Inc.*, 76 F. Supp. 3d 1388, 1391 (S.D. Fla. 2014); *Baptist Hosp. of Miami, Inc. v. Medica Healthcare Plans, Inc.*, No. 18-CV-25460-UU, 2019 WL 1915386, at *2 (S.D. Fla. Mar. 21, 2019); *Hepstall v. Humana Health Plan, Inc.*, No. 18-0163-CG-MU, 2018 WL 4677871, *2-3 (S.D. Ala. July 3, 2018).

The Court would find that MAOs and downstream entities such as Regal "act under" federal officers for purposes of federal officer removal. By administering Medicare benefits, MAOs and downstream entities "assist, or [] help carry out, the duties or tasks of the federal superior." *Watson*, 551 U.S. at 152.[2] This relationship is deeper than simply operating in a heavily regulated field, because if MAOs and downstream entities did not perform their tasks, the government would have to carry out the work of administering Medicare itself. While MAOs and downstream entities may operate with less direct supervision than providers under Medicare Part B, they still help "fulfill [a] basic governmental task" by administering Medicare benefits.[3] *Id.* at 153. In this way, the government's relationship to these entities is "more akin to a delegation of CMS administrative obligations than a regulation of otherwise private insurance." *Body & Mind*, 2017 WL 653270, at *5. In sum, MAOs, downstream entities such as Regal, and CMS have "an unusually close [relationship] involving detailed regulation, monitoring, and supervision." *Id.* The Court recognizes that the issue is close, but in light of the Supreme Court's directive that federal officer removal should be liberally construed, the Court finds that

---

[2] As stated in *Watson*, "the removal statute applies to private persons 'who lawfully assist' the federal officer 'in the performance of his official duty' . . . . And in *City of Greenwood v. Peacock*, 384 U.S. 808, 824 (1966), in interpreting a related removal provision, the Court repeated that the statute authorized removal by private parties 'only' if they were 'authorized to act with or for [federal officers or agents] in affirmatively executing duties under . . . federal law." 551 U.S. at 151.

[3] The Ninth Circuit has observed that a number of circuit courts have held that Medicare B carriers who contract with the Department of health and Human Services "act under" a federal officer. *See Goncalves v. Rady Children's Hosp. San Diego*, 865 F.3d 1237, 1249 n.2 (9th Cir. 2017) ("We also note that a number of federal courts have determined that Medicare Part B carriers contracting with the U.S. Department of Health and Human Services 'act under' a federal officer. *See, e.g., Midland Psychiatric Assocs., Inc. v. United States*, 145 F.3d 1000, 1004-05 (8th Cir. 1998); *Bodimetric Health Servs., Inc. v. Aetna Life & Cas.*, 903 F.2d 480, 487-88 (7th Cir. 1990); *Grp. Health Inc. v. Blue Cross Ass'n*, 793 F.2d 491, 493 (2d Cir. 1986); *Peterson v. Blue Cross/Blue Shield*, 508 F.2d 55, 57-58 (5th Cir. 1975).").

Regal "act[ed] under" federal officers in administering Medicare benefits.

## 2. *Colorable Federal Defense*

Next, Defendant must demonstrate that it has a "colorable federal defense" in order to maintain removal under § 1442(a)(1). This does not require a demonstration that the removing party will win its case. *See Willingham v. Morgan*, 395 U.S. 402, 407 (1969). "In construing the colorable federal defense requirement, [the Supreme Court] ha[s] rejected a 'narrow, grudging interpretation' of the statute, recognizing that 'one of the most important reasons for removal is to have the validity of the defense . . . tried in a federal court.'" *Jefferson Cnty., Ala. v. Acker*, 527 U.S. 423, 431 (1999) (quoting *Willingham*, 395 U.S. at 407).

Defendants assert two federal defenses: Medicare preemption and failure to exhaust administrative remedies. Multiple courts have found that colorable federal defenses exist in similar contexts, regardless of whether those defenses succeeded on the merits. *See, e.g.*, *Inchauspe*, 2018 WL 566790, at *4; *Body & Mind*, 2017 WL 653270, at *3; *Gordy*, 2019 WL 1237421, at *4-5. Medicare Part C contains a preemption provision, which provides that "[t]he standards established under this part shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations under this part." 42 U.S.C. § 1395w-26(b)(3). The Ninth Circuit has found that this language was "intended . . . to preempt at least some common law claims." *Do Sung Uhm v. Humana, Inc.*, 620 F.3d 1134, 1155 (9th Cir. 2010). Regarding exhaustion, the statute provides that claims "arising under" the Medicare Act are only subject to judicial review if administrative remedies have first been exhausted. *See* 42 U.S.C. §§ 405(g)-(h); *Heckler v. Ringer*, 466 U.S. 602, 614-15 (1984). Courts have rejected attempts by plaintiffs to avoid the exhaustion requirement by "recharacterizing their claims under state and federal causes of action." *Kaiser v. Blue Cross*, 347 F.3d 1107, 1114 (9th Cir. 2003) (quoting *Bodimetric Health Servs., Inc. v. Aetna Life & Casualty*, 903 F.2d 487 (7th Cir. 1990)). Here, Regal argues that Plaintiffs' claims were subject to the exhaustion requirements and that Plaintiffs did not exhaust their administrative remedies before bringing their claims in federal court. As such, the Court finds that Regal "clearly" has colorable federal defenses of preemption and exhaustion. *Inchauspe*, 2018 WL 566790, at *4.

Based on the foregoing discussion, the Court would **DENY** Plaintiffs' motion to remand.

## B. 12(b)(1) – Administrative Exhaustion

Regal argues that Plaintiffs' wrongful death claim must be dismissed because Plaintiffs failed to exhaust their administrative remedies under the Medicare Act. "The issue of exhaustion bears on the district court's jurisdiction." *Uhm*, 620 F.3d at 1140. Claims "arising under" the Medicare Act are subject to judicial review only if administrative remedies have first been exhausted. *See* 42 U.S.C. §§ 405(g)-(h); *Heckler v. Ringer*, 466 U.S. 602, 614-15 (1984). Thus, the Court must determine whether Plaintiffs' wrongful death claim arises under the Medicare Act.

"The Supreme Court has identified two circumstances in which a claim 'arises under' the Medicare Act: (1) where the 'standing and the substantive basis for the presentation of the claims' is the Medicare Act, *Heckler*, 466 U.S. at 615 (internal quotations omitted); and (2) where the claims are 'inextricably intertwined' with a claim for Medicare benefits, *id*. at 614." *Uhm*, 620 F.3d at 1141. Here, Regal argues that Plaintiffs' wrongful death claim arises under the Medicare Act because it is "inextricably intertwined" with a claim for Medicare benefits.

Courts consider claims to be "inextricably intertwined" with the Medicare Act when they are "cleverly concealed claims for benefits." *Kaiser v. Blue Cross*, 347 F.3d 1107, 1112 (9th Cir. 2003) (quoting *United States v. Blue Cross & Blue Shield of Ala., Inc*., 156 F.3d 1098, 1109 (11th Cir. 1998)). For example, in *Heckler*, the plaintiffs brought various claims challenging the denial of coverage for a surgery to relieve their respiratory distress. *Heckler*, 466 U.S. at 604-12. The Supreme Court construed the plaintiffs' claims as, "at bottom, a claim that they should be paid for their [] surgery." *Id*. at 614. If the plaintiffs obtained a favorable ruling during the administrative appeal, "only essential ministerial details [would] remain before [the plaintiffs] would receive reimbursement." *Id*. at 615. Based on this determination, the Supreme Court found that the claims arose under the Medicare Act and were subject to the administrative exhaustion requirement. *Id*. at 616.

Likewise, in *Uhm*, the plaintiffs sued after their provider refused to pay for their prescription drug benefits under Medicare Part D, forcing them to pay out-of-pocket for two months of prescription drugs. *Uhm*, 620 F.3d at 1139. The plaintiffs brought claims for breach of contract, fraud, unjust enrichment, and violation of state consumer protection laws. *Id*. In analyzing these claims, the Ninth Circuit rejected the plaintiffs' "argument that, because they [we]re not seeking reimbursement of lost benefits, their claims d[id] not 'arise under' the Act." *Id*. at 1142. Instead, the Court explained that "whether or not plaintiffs seek reimbursement of

benefits is not 'strongly probative' of whether a claim 'arises under' the Medicare Act." *Id.* (quoting *Kaiser*, 347 F.3d at 1112); *see also Roberts v. United Healthcare Services, Inc.*, 2 Cal. App. 5th 132, 150 (2016) ("In assessing whether a claim is subject to exhaustion, courts look not only to how the plaintiff has styled his claim, but also to its substance."). The Court in *Uhm* found that "the Uhms' breach of contract claim [was] a backdoor attempt to enforce the Act's requirements and to secure a remedy for Humana's alleged failure to provide benefits," and that the Uhms had not "allege[d] any injury that could not be remedied through the retroactive payment of Medicare drug benefits." *Uhm*, 620 F.3d at 1143-44. Thus, the Circuit found that "at bottom, [the Uhms were] complaining about the denial of Medicare benefits," so the claims arose under the Medicare Act and were subject to the administrative exhaustion requirement. *Id.* at 1142-43.

In contrast, where a claim is "wholly collateral" to a claim for benefits, administrative exhaustion is not necessary. *Heckler*, 466 U.S. at 618. The Ninth Circuit analyzed the issue in *Ardary v. Aetna Health Plans*, 98 F.3d 496 (9th Cir. 1996). In *Ardary*, a woman suffered a heart attack and was taken to a local hospital; despite requests from her physician, her Medicare plan administrator refused to authorize airlift transportation to a better-equipped hospital. *Id.* at 497-98. Her family brought a complaint for wrongful death, among other tort theories, after she died. *Id.* at 498. Even though the plaintiffs conceded that their claims were "predicated on" the plan administrator's failure to authorize the airlift, the Court found that the claims were not "inextricably intertwined" with the denial of Medicare benefits because the plaintiffs were "at bottom not seeking to recover benefits," and because their injury "[could not] be remedied by the retroactive authorization or payment of the airlift transfer."[4] *Id.* at 500.

Similarly, in *McCall v. PacifiCare of Cal., Inc.*, 25 Cal. 4th 412, 415 (2001), a lung care patient sued his doctor, an HMO, and a physician provider group after they refused to refer him to a specialist for a lung transplant, ultimately forcing him to disenroll from the HMO in order to get on the Medicare list for a transplant. The plaintiffs (the patient and his wife) alleged claims for negligence, willful misconduct, fraud, and infliction of emotional distress. *Id.* The California Supreme Court held that "[t]he 'inextricably intertwined' language in [*Heckler*] is

---

[4] A district court considering a similar question in *Shakespeare v. SCAN Health Plan, Inc.*, No. 3: 17-CV-568-BTM-MDD, 2018 WL 340422, at *4 (S.D. Cal. Jan. 8, 2018), distinguished *Ardary* on the grounds that before the plaintiff signed up for the plan, the defendant had told the plaintiff than an emergency transfer would be authorized in such a situation. However, the Court disagrees with this attempt to limit *Ardary*, as nothing in *Ardary*'s reasoning relied on that previous promise as a reason why exhaustion was not necessary.

more correctly read as sweeping within the administrative review process only those claims that, 'at bottom,' seek reimbursement or payment for medical services, but not a claim . . . [that] incidentally refers to a denial of benefits under the Medicare Act." *Id.* at 425. The *McCall* court provided two examples of claims "collateral to, not inextricably intertwined with, Medicare benefit claims": (1) "a provider may negligently fail to use ordinary skill and care in treating a beneficiary, or properly to advise the beneficiary concerning his health condition or appropriate treatment options, whether or not such options are covered by Medicare, thus preventing the beneficiary from seeking such treatment even at his own expense," and (2) "a provider may fail to provide appropriate referrals to specialists, and thus prevent the beneficiary from obtaining appropriate care, again without regard to coverage." *Id.* The court concluded that administrative exhaustion was not required, "[b]ecause the McCalls may be able to prove the elements of some or all of their causes of action without regard, or only incidentally, to Medicare coverage determinations, because . . . none of their causes of action seeks, at bottom, payment or reimbursement of a Medicare claim or falls within the Medicare administrative review process, and because the harm they allegedly suffered thus is not remediable within that process." *Id.* at 426.

A district court in this district reached the same conclusion in *Inchauspe*. There, the plaintiff brought claims for tortious breach of the implied covenant of good faith and fair dealing, breach of contract, financial elder abuse, negligence, professional negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress after he suffered a stroke and was denied acute rehabilitation services, despite his doctor's orders. *Inchauspe*, 2018 WL 566790, at *1. The court found that the claim did not arise under the Medicare Act, agreeing with the plaintiff's characterization of his claims as "common law claims seeking tort damages for the physical and mental harm that he suffered as a result of delays in providing him with appropriate treatment and from being forced to receive substandard care." *Id.* at *7. The district court explained:

> Having reviewed the complaint in light of the foregoing authorities, the Court finds that plaintiff's claims against SCAN do not, at bottom, seek Medicare benefits or reimbursement for SCAN's failure to provide those benefits. *Cf.* [*Heckler*], 466 U.S. at 614 (plaintiffs sought reimbursement for surgeries already performed or prospective approval for the procedure); *Uhm*, 620 F.3d at 1143-44 (plaintiffs paid for medications out-of-pocket and were at bottom seeking reimbursement). Rather, plaintiff's claims seek consequential damages for his

physical and mental suffering caused by SCAN's failure to provide adequate medical care. As in *Ardary*, plaintiff's claims may be predicated on SCAN's failure to authorize acute rehabilitative services, but plaintiff is not seeking to recover Medicare benefits, and his injuries cannot be remedied by a retroactive payment of benefits. *See Ardary*, 98 F.3d at 500-01. The Court also finds plaintiff's claims comparable to those asserted by the plaintiffs in *McCall* that were based on the defendant's failure to approve a specialist referral. Thus, plaintiff's claims are comparable to those asserted in *Ardary* and *McCall* in that they are not "inextricably intertwined" with a claim for benefits, do not "arise under" the Act, and therefore plaintiff is not required to exhaust Medicare's administrative review procedures before seeking judicial review.

*Id.*

Here, the Court would find that Plaintiffs' claims are more similar to those in *Ardary*, *McCall*, and *Inchauspe* than those in *Heckler* and *Uhm*. Plaintiffs do not seek reimbursement for previously provided care or a determination that future care will be covered, as the plaintiffs did in *Uhm* and *Heckler*. Instead, Plaintiffs seek remedies in tort for Defendants' alleged failure to provide Ms. Escarcega with an appropriate level of care by transferring her to a different facility. While Plaintiffs' wrongful death claim is predicated on Defendants' failure to authorize the transfer, the claim is not an attempt to recover Medicare benefits. Equally important, Plaintiffs' injuries from the refusal to transfer Ms. Escarcega cannot be remedied by a retroactive payment of benefits. *See Ardary*, 98 F.3d at 500-01. Regal argues that this case is distinguishable from *Inchauspe* because unlike in *Inchauspe*, Ms. Escarcega's doctor did not authorize the transfer. Regal argues that it was actually prohibited from approving Ms. Escarcega's transfer, because Medicare regulations "prohibit[] interference with provider advice to enrollees." 42 U.S.C. § 1395w-22(j)(3); 42 C.F.R. § 422.206. However, *McCall* also involved a situation in which the physician and the Medicare administrator both refused to refer the patient to the necessary care. *See McCall*, 25 Cal. 4th at 415. Moreover, the fact that Regal may try to defend its actions based on the fact that Dr. Bassuk never authorized the transfer does not mean that the root of Plaintiffs' wrongful death claim is actually a claim for Medicare benefits. The Court concludes that, "at bottom," Plaintiffs' claims are based on Defendants' alleged failure to provide adequate medical care, not on the denial of Medicare benefits. *Heckler*, 466 U.S. at 614. Therefore, the Court would find that Plaintiffs' wrongful death claim is not "inextricably intertwined" with a claim for benefits, and the claim does not "arise under" the Medicare Act. *Heckler v. Ringer*, 466 U.S. 602, 614-15 (1984).

Based on the foregoing discussion, the Court would find that Plaintiffs were not required

to exhaust their administrative remedies under the Medicare Act.

### C.  12(b)(6) – Medicare Preemption

Finally, Regal argues that the wrongful death claim should be dismissed because it is preempted by the Medicare Act.  The 2003 amendments to Medicare Part C contain an express preemption clause, providing:

> The standards established under this part shall supersede any State law or regulation (other than State licensing laws or State laws relating to plan solvency) with respect to MA plans which are offered by MA organizations under this part.

42 U.S.C. § 1395w-26(b)(3).  Interpreting this provision, CMS has explained that "all State standards, including those established through case law, are preempted to the extent that they specifically would regulate MA plans, with exceptions of State licensing and solvency laws." Medicare Program; Establishment of the Medicare Advantage Program, 70 Fed. Reg. 4588, 4665 (Jan. 28, 2005).  However, "[o]ther State health and safety standards, or generally applicable standards, that do not involve regulation of an MA plan are not preempted." *Id*.

Two lines of cases have sprung up in relation to the preemption clause.  One, relied on by Plaintiffs, holds that the Medicare preemption clause was not intended to reach "generally applicable state contract and tort law actions." *Cotton v. StarCare Med. Grp., Inc.*, 183 Cal. App. 4th 437, 453-54 (2010); *see also McCall*, 25 Cal. 4th at 423 ("By clear implication . . . Congress left open a wide field for the operation of state law pertaining to standards for the practice of medicine and the manner in which medical services are delivered to Medicare beneficiaries.") (predating enactment of 2003 amendments but cited favorably by *Cotton*, 183 Cal. App. 4th at 452).  Under that reasoning, Plaintiffs' wrongful death claim, based on state tort law, would not be preempted.

In contrast, other cases hold that "some common law claims fall within the ambit of the Act's preemption clause." *Uhm*, 620 F.3d at 1156.  In *Roberts v. United Healthcare Servs., Inc.*, 2 Cal. App. 5th 132, 146 (2016), the California appeals court stated, "[w]e also reject *Cotton*'s holding that Part C's preemption clause only reaches laws specifically targeting Medicare Advantage plans."  Under this line of cases, state common law may be preempted to the extent that it would "directly undermine" CMS's regulatory authority over the Medicare program. *Id.* at 148.  *Uhm* and *Roberts* both involved allegations of deceptive marketing materials by Medicare providers.  The court in *Uhm* explained:

Here, in order to determine whether Humana committed a fraud or fraud in the

> inducement, a court would necessarily need to determine whether the written and
> oral statements were misleading . . . . Were a state court to determine that
> Humana's marketing materials constituted misrepresentations resulting in fraud or
> fraud in the inducement, it would directly undermine CMS's prior determination
> that those materials were not misleading and in turn undermine CMS's ability to
> create its own standards for what constitutes "misleading" information about
> Medicare Part D. Thus, the Uhms' fraud and fraud in the inducement claims must
> be preempted.

*Uhm*, 620 F.3d at 1157. The court clarified that the inquiry is case-specific, stating: "We emphasize that this holding does not mean that all common law fraud and fraud in the inducement claims would be preempted under the Act. The preemption inquiry turns on the specific allegations forming the basis of those claims, not their labels." *Id.* at 1157 n.35. This Court is bound by the Ninth Circuit's holding in *Uhm*; moreover, this Court finds that *Uhm* is more consistent with CMS's explanation that "all State standards, including those established through case law, are preempted to the extent that they specifically would regulate MA plans . . . ." Medicare Program; Establishment of the Medicare Advantage Program, 70 Fed. Reg. 4588, 4665 (Jan. 28, 2005). As the California appeals court in *Roberts* stated, "[t]he clause means what it says, and the Medicare Advantage standards supersede '*any* State law or regulation' 'with respect to' the plans governed by those standards, except in the two carve-outs for licensing and plan solvency." *Roberts*, 2 Cal. App. 5th at 143.

Here, Plaintiffs allege wrongful death against Regal based on Regal's failure to approve a request to transfer Ms. Escarcega to a different facility. As before, Regal points out that it was prohibited from transferring Ms. Escarcega without a request from her physician, who did not make one. Regal argues that Plaintiffs' wrongful death claim conflicts with several Medicare provisions. For example, Regal points to Medicare's provision "prohibiting interference with provider advice to enrollees." 42 U.S.C. § 1395w-22(j)(3). Similarly, Medicare provides that "a skilled nursing facility must permit each resident to remain in the facility and must not transfer or discharge the resident from the facility unless − (i) the transfer or discharge is necessary to meet the resident's welfare and the resident's welfare cannot be met in the facility;" "the documentation must be made by the resident's physician." 42 U.S.C.S. § 1396r(c)(2)(A). The Medicare regulations provide that "[a] physician must personally approve in writing a recommendation that an individual be admitted to a facility." 42 C.F.R. § 483.30. And in order for a transfer to occur, documentation in the resident's medical record must include "the specific resident need(s) that cannot be met, facility attempts to meet the resident needs, and the service

available at the receiving facility to meet the need(s)." 42 C.F.R. § 483.15. In other words, patient transfers are directly regulated under Medicare.

While the Court finds this to be a close case, the Court concludes that Plaintiffs' wrongful death claim against Regal is preempted. In order to determine whether Regal is liable for Ms. Escarcega's wrongful death, the Court would necessarily need to determine whether Regal should have transferred Ms. Escarcega to a different facility. *See Uhm*, 620 F.3d at 1157. And were the Court to determine that Regal should have approved the transfer request, it would directly undermine the statute and regulations' directions that entities may not interfere with provider advice to enrollees and that a physician must document the need for a transfer. *See id.* In this way, this case differs from *Inchauspe*, in which the defendant refused to provide a needed service *despite* a recommendation from the plaintiff's physician. *Inchauspe*, 2018 WL 566790, at *2. Because the physician in this case, Dr. Bassuk, did not recommend transferring Ms. Escarcega, ruling in favor of Plaintiffs on their wrongful death claim against Regal would require finding that Regal should have approved Ms. Escarcega's transfer in spite of the physician's decision not to recommend a transfer.[5] In effect, Plaintiffs seek an order finding that Regal should have gone against the physician's recommendation and transferred Ms. Escarcega, even though the regulations require a physician's approval for a transfer. Such a ruling would "directly undermine" the Medicare Act's provisions and regulations indicating that Regal was not to interfere with provider advice and that physician documentation was necessary for a transfer. This weighs in favor of a finding that Plaintiffs' wrongful death claim against Regal is

---

[5] Plaintiffs offer to amend their Complaint to allege that Dr.Bassuk conspired with Regal to refrain from ordering Ms. Escarcega's transfer. *See* Pl. Supp. at 7-8. According to Plaintiffs' proposed amendment, Dr. Bassuk declined to order such a transfer in order to become accepted as a "partner" of Regal. *Id.* Plaintiffs state:

> Dr. Bassuk . . . refrained from ordering Ms. Escarcega's admission to the hospital even though he actually knew that such admission was medically appropriate to her condition and its proper treatment. Ms. Escarcega's deteriorating condition . . . required immediate care in a hospital setting, and such a transfer was essential to her health and safety. Given her medical condition, there is no medical explanation for Dr. Bassuk's failure to order her admission to hospital than [Regal's] said policy and adverse financial incentives to which Dr. Bassuk was subjected.

*Id.* at 7-8. Regal counters that these allegations are implausible, because Regal is not a partnership, so Dr. Bassuk cannot have altered his medical care in order to become a partner in Regal. Moreover, Regal points out that "Dr. Bassuk was already an in-network participating physician of Regal," so it does not make sense that Dr. Bassuk would have had to alter his level of care in order to obtain acceptance by Regal. Further, even if Dr. Bassuk deliberately declined to provide Ms. Escarcega with the care that she needed in order to curry favor with Regal, this does not in itself establish wrongdoing by Regal—only by Dr. Bassuk. It would not change the fact that the Medicare regulations prohibited Regal from ordering Ms. Escarcega's transfer without a recommendation from Dr. Bassuk. The Court would find that Regal's responses render Plaintiffs' proposed amendments implausible, and therefore futile.

preempted.

Plaintiffs raise an additional argument as to why preemption should not apply here. Plaintiffs argue that preemption does not apply because Regal is not an MAO. *See* Pl. Supp. at 3-4. Plaintiffs argue that the express preemption provision, which states that the Medicare standards preempt "any State law or regulation . . . with respect to MA plans which are offered by MA organizations under this part," is limited by its language to MA plans offered by MAOs. *Id.* at 3 (quoting 42 U.S.C. § 1395w-26(b)(3)). The Court does not find this argument persuasive. For one, this case does involve an MA plan offered by an MAO – it is simply a plan whose administration was subcontracted to Regal. This fact does not remove it from the ambit of the language in the preemption provision. Further, CMS maintains a high degree of control over an MAO's contract with a downstream entity, with the regulations preserving CMS's audit power over the downstream entity's Medicare-related activities, setting specific requirements over the contents of the contract between the MAO and the downstream entity, and requiring such contracts to allow for revocation if CMS is dissatisfied with the downstream entity's performance. 42 U.S.C. § 422.504(i). While a first-tier or downstream entity is one (or several) layers removed from directly contracting with CMS, first-tier and downstream entities are largely subject to the same requirements. Again, this fact suggests that a direct contractual relationship with CMS is not the touchstone for application of the preemption provision. MAO or downstream entity, the Medicare regulations are largely the same.

Moreover, as Regal points out, the Ninth Circuit has already held that Medicare preemption applies in a similar context. In *Uhm*, the plaintiffs sued both Humana Health Plan, Inc. and Humana, Inc. under Medicare Part D. *Uhm*, 620 F.3d at 1157. The Medicare Part D preemption provision provides:

> The provisions of sections 1395w-24(g) [(prohibition of premium taxes)] and 1395w-26(b)(3) [(preemption)] of this title shall apply with respect to PDP sponsors and prescription drug plans under this part in the same manner as such sections apply to MA organizations and MA plans under part C of this subchapter.

42 U.S.C. § 1395w-112(g). The Plaintiffs "argued in their motion for reconsideration that regardless of whether the Act preempt[ed] their claims against Humana Health Plan, Inc., their claims against Humana, Inc., [were] not preempted because Humana, Inc., is not a CMS-approved PDP sponsor, and the Act's preemption provision applies only to PDP sponsors." *Uhm*, 620 F.3d at 1157. The Circuit rejected this argument, finding that claims against Humana,

Inc., were also preempted because they derived from its relationship with Humana Health Plan, Inc., the PDP sponsor. Importantly, the Ninth Circuit explained: "the language about PDP sponsors modifies or describes what a PDP is − it does not shift the locus of preemption from the prescription drug plan to the sponsor." *Id.* at 1158. In the same way, the language about MA organizations in the Part C preemption provision describes how MA plans are administered, but it "does not shift the locus of preemption from the [MA plan] to the [MAO]." *Id.* Therefore, *Uhm* supports a finding that Plaintiffs' claims against Regal are preempted, despite the fact that Regal is a downstream entity rather than an MAO. The claims against Regal are preempted because they derive from Regal's relationship with an MAO. The Court would **GRANT** Regal's motion to dismiss on that basis.

The Court notes that Regal's preemption defense is only applicable to the wrongful death claim against Regal, not the other defendants. This is because Regal's defense relies on the Medicare Act's provisions limiting a MAO's ability to transfer a patient without a physician directive to do so. While the Court dismisses the wrongful death claim against Regal, it does not dismiss the wrongful death claim against the remaining defendants. And because the wrongful death claim was the sole claim brought against Regal, Regal is dismissed as a defendant. Regal was the only defendant on whom the Court's federal officer jurisdiction was based. The Court declines to exercise supplemental jurisdiction over the remaining claims. *C.f. New Rock Asset Partners, L.P. v. Preferred Entity Advancements*, 101 F.3d 1492, 1495 (3d Cir. 1996); *Destfino v. Reiswig*, 630 F.3d 952, 958 (9th Cir. 2011). Therefore, the Court remands the remaining state claims back to the Los Angeles Superior Court.

## V. <u>Conclusion</u>

Based on the foregoing discussion, the Court **DENIES** Plaintiffs' Motion to Remand. Additionally, the Court **GRANTS** Regal's Motion to Dismiss Plaintiffs' wrongful death claim against Regal. Finally, the Court **REMANDS** the remaining claims back to the Los Angeles Superior Court.